**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Rajiv V. Thairani (State Bar No. 344390)
rajiv@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN BELTRAN and MARY BROWN, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NVIDIA CORPORATION,<br><br>Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS


INTRODUCTION .....4

THE PARTIES .....6

JURISDICTION AND VENUE .....6

DELAYED DISCOVERY AND TOLLING .....7

SUBSTANTIVE ALLEGATIONS .....8

A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Based Tracking Technologies. .....8

B. Defendant Falsely Informed Users That They Could Decline the Website's Use of "All" Cookies. .....13

C. The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendant's Website. .....23

1. The Website Causes the Interception of the Contents of Communications. .....23
2. Facebook Cookies .....24
3. Google Cookies .....28
4. TikTok Cookies .....36
5. Adobe Cookies .....41
6. LiveRamp Cookies .....46
7. Taboola Cookies .....48
8. Salesforce Cookies .....50
9. Additional Third Party Cookies .....52

D. The Third Parties Intercept User Communications While in Transit. .....59

E. The Private Communications Collected are Valuable. .....62

F. Defendant's Conduct Constitutes an Egregious Breach of Established Norms Protecting Individual Privacy. .....63

PLAINTIFFS' EXPERIENCES .....67

CLASS ALLEGATIONS .....74

CAUSES OF ACTION .....76

First Cause of Action: Invasion of Privacy .....76

Second Cause of Action: Intrusion Upon Seclusion .....79

Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)....................81

Fourth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation.......85

Fifth Cause of Action: Unjust Enrichment ....................89

Plaintiffs Martin Beltran and Mary Brown ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against NVIDIA Corporation ("Defendant" or "NVIDIA"). Plaintiffs' allegations against Defendant are based upon information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## INTRODUCTION

1. This Class Action Complaint concerns an egregious privacy violation and total breach of consumer trust and confidence in violation of California law. When consumers visit Defendant's ecommerce website (www.nvidia.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can choose to "Manage Cookies" as shown in the following screenshot:




2. Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers, and that visitors' browsing activities and communications would be kept in confidence from such third parties. Those representations were false.

3. Even after users elect to "Decline All" cookies in the Cookie Settings window, Defendant nonetheless caused multiple third parties—including Meta Platforms, Inc. (formerly Facebook), Google LLC (DoubleClick), ByteDance Ltd. (TikTok), Adobe, Inc. (omtrcd.net), LiveRamp Holdings, Inc. (rlcdn.com), Taboola.com, Ltd., Salesforce, Inc. (Evergage), PubMatic, Inc., Microsoft Corp. (AppNexus), LinkedIn Corporation (a subsidiary

of Microsoft Corp.), X Corp. (Twitter), Dun & Bradstreet Holdings, Inc. (Eyeota), Yahoo, Inc., NextRoll, Inc. (Adroll.com), Magnite, Inc. (Rubicon Project), Index Exchange, Inc. (Casale Media), Bidswitch, Inc., TripleLift, Inc. (3lift.com), Teads Holding Co. (Outbrain) (outbrain.com), and OpenX Technologies, Inc. (the "Third Parties")—to place and/or transmit cookies that tracked users' website browsing activities and enabled the Third Parties to intercept their private communications on the Website.

4. Contrary to users' express declination of cookies and tracking technologies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs' and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. Defendant enabled such interceptions, tracking, and transmissions in breach of its express promise to Plaintiff and similarly situated class members that Defendant would keep their Website communications and activities in confidence from such third parties.

5. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles with unknown parties to further their financial gain.

6. This type of tracking and data sharing is exactly what the Website visitors sought to avoid when they clicked or selected the "Decline All" button and/or by toggling off "Performance Cookies" and "Advertising Cookies" in the Website's Cookie Settings window. Defendant falsely told Website users that it respected their privacy choices and would refrain

from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent to the tracking and sharing of their data with third parties and clear notice of users' intent to provide their Website activities and communications in confidence to Defendant, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7. Plaintiff Martin Beltran is, and was at all relevant times, an individual and resident of San Francisco, California. Plaintiff intends to remain in California and makes his permanent home there.

8. Plaintiff Mary Brown is, and was at all relevant times, an individual and resident of Concord, California. Plaintiff intends to remain in California and makes her permanent home there.

9. Defendant NVIDIA Corporation is a Delaware corporation with its headquarters and principal place of business in Santa Clara, California.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

11. The injuries, damages and/or harm upon which this action is based occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12. Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

**DELAYED DISCOVERY AND TOLLING**

15. The delayed discovery rule applies to Plaintiff Beltran's and Plaintiff Brown's claims. Plaintiffs Beltran and Brown were unaware that, even though they rejected all non-strictly necessary cookies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data. Plaintiff Beltran first learned of Defendant's privacy violations from counsel in March 2026, while Plaintiff Brown first learned of those violations from counsel in November 2026. As alleged above, neither Plaintiff Beltran nor Plaintiff Brown possesses the technical expertise necessary to determine whether the Website honored users' requests to opt out of cookies and tracking technologies.

16. When visiting the Website, Plaintiff Beltran and Plaintiff Brown exercised reasonable diligence under the circumstances. Plaintiffs reviewed Defendant's Cookie Banner, examined the available privacy settings, affirmatively disabled non-strictly necessary cookies and tracking technologies, and confirmed their selections. Plaintiffs thus took affirmative steps to protect their privacy and reasonably believed that Defendant would honor their selections. Plaintiffs had no reason to suspect that Defendant was secretly disregarding its express representations, and nothing alerted them to Defendant's misconduct. In particular, Plaintiffs did not observe any indication that their privacy selections were being disregarded, and Defendant's continued tracking was not apparent from their ordinary use of the Website. Plaintiffs therefore had no reason to suspect that they had suffered an injury.

17. Determining whether Defendant was, despite its promises not to, nevertheless tracking them would have required (i) Plaintiffs to suspect that Defendant was misrepresenting its practices and (ii) Plaintiffs to employ technical tools, such as browser developer tools, to

inspect cookie placement and network transmissions at that time. However, Plaintiffs were (and are) unfamiliar with such tools and lacked the technical expertise to use them. Accordingly, Plaintiffs had neither reason to suspect that further investigation was necessary nor the technical knowledge required to independently detect Defendant's undisclosed tracking had they suspected that Defendant's cookie banner was misrepresenting the truth. Under these circumstances, Plaintiffs could not reasonably have discovered Defendant's misconduct earlier through the exercise of reasonable diligence.

## SUBSTANTIVE ALLEGATIONS

### A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Based Tracking Technologies.

18. Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address which allows the Website server to identify the origin of the request and return the response.

19. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

20. As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Website were located in California.

21. Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interfaces (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

22. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

23. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

24. A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com; td.doubleclick.net; analytics.tiktok.com; omtrcd.net, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third party to recognize and differentiate

individual users across websites (including the Website) and across multiple browsing sessions.

25. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Website;
- **Website Interactions:** Data on which links, buttons, or ads on the Website a user clicks;
- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;
- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;
- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;
- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;
- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or
- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

26. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and content preferences to enable content recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

27. Defendant is a technology company best known for designing graphics processing units (GPUs), which are widely used in gaming, professional visualization, data centers, and artificial intelligence. In addition to hardware, NVIDIA develops software platforms and systems for AI, machine learning, and accelerated computing. Defendant also owns and operates the Website, which allows visitors to receive information about its hardware and software products and purchase products. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit

history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

28. Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

29. Defendant admitted that the Website allows third parties to collect user data with cookies in its Privacy Policy as follows:

> If you visit any of our NVIDIA websites, we or our third-party partners collect information using cookies, web beacons, or log file information. Please see our Cookie Policy for more details.[1]

30. Further, Defendant explained the third-party cookies it used on the Website as follows in its Cookie Policy:

> A cookie is a small data file made up of letters and numbers which is placed by a website on the device you use to access the Internet. Cookies serve different purposes, and may be tied to personal information. At NVIDIA, we use cookies to help deliver and improve our websites (such as NVIDIA.com, Geforce.com, and Developer.nvidia.com) through information about website usage and settings, as described below. How we use cookies is governed by this Cookie Policy and by our Privacy Policy.[2]

---

[1] NVIDIA Privacy Policy (Effective date September 22, 2025) (available at https://www.nvidia.com/en-us/about-nvidia/privacy-policy). Similar language has appeared in prior versions of NVIDIA Privacy Policy.

[2] NVIDIA Website Cookie Policy (as it appeared on 7/4/2024) (available at https://www.nvidia.com/en-us/about-nvidia/cookie-policy/) (the "Cookie Policy"). Defendant has subsequently updated its Cookie Policy but, based on information and belief, this version was in effect at the time of Plaintiffs' rejection of cookies on the Website.

31. Further, Defendant described the categories of cookies used on the Website as follows in its Cookie Policy:

> **Performance Cookies**
>
> These cookies are used to better understand and optimize the web experience. These cookies collect information such as pages visited or purchased made through our eStore.
>
> **Advertising Cookies**
>
> These cookies are used to personalize your web experience with relevant advertisements. These cookies collect information such as pages visited or purchases made through our eStore.
>
> **Required Cookies**
>
> These cookies are required for the website to properly function on your device. These cookies collect information such as location (for language settings), account management, event registration, driver installs, or email preferences.

**B. <u>Defendant Falsely Informed Users That They Could Decline the Website's Use of "All" Cookies.</u>**

32. When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "NVIDIA uses cookies to enable and improve the use of the website…You can manage your cookie settings by clicking 'Manage Cookies' or going to the NVIDIA Privacy Center." Accordingly, the banner then purported to provide users the opportunity to "Manage Cookies" by clicking the button as shown in the following screenshot from the Website:




33. Plaintiffs and other Website users who clicked or selected the "Manage Cookies" button were then directed to Defendant's "Cookie Settings" window. There, Defendant further represented, "NVIDIA websites use cookies to deliver and improve the visitor experience. Learn more about the cookies we use on our Cookie Policy page." The

"Cookie Settings" window identified three categories of cookies in use on the Website, including "Performance Cookies" and "Advertising Cookies," each of which could be turned "off" by adjusting a toggle or setting to do so. Defendant represented that "Required Cookies" are "required for the site to function" and "cannot be turned off[.]" Besides the toggles or settings available to decline specific categories of cookies, there was also a "Decline All" button that users could click or select, as shown in the following screenshot:



34. Users who clicked or selected the "Decline All" button and/or toggled off "Performance Cookies" and "Advertising Cookies," thereby indicating their choice and/or agreement to decline "All" cookies and tracking technologies in use on the Website, including all Performance and Advertising cookies (other than those "Required Cookies" needed for the Website to function), could then continue to browse the Website, as the popup cookie consent banner and Cookie Settings window disappeared.

35. Defendant's popup cookie consent banner and Cookie Settings window led Plaintiffs, and all those Website users similarly situated, to believe that they declined "All" cookies and tracking technologies, especially those that were used for "understand where people most engage with links" and "build a profile of [user] interests to show [users] relevant ads on other sites." The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that they could browse the Website in confidence, and that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Decline All" cookies button.

36. Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users clicked or selected the "Decline All" cookies button and/or toggled off "Performance Cookies" and "Advertising Cookies," they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website, and that they intended for their Private Communications to be kept in confidence from Third Parties.

37. Nevertheless, even after receiving that notice, Defendant caused the Third Party tracking cookies, including the Third Parties' cookies, to be placed on Website users' browsers and devices and/or transmitted to the Third Parties, thereby enabling the Third

Parties to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even after Defendant promised consumers that they could browse in confidence, and consumers like Plaintiffs tried to protect their privacy by blocking or rejecting personalized advertisements and unnecessary cookies in the cookie preference window, Defendant breached that confidence and failed to prevent cookies from being transmitted to the Third Parties, enabling them to track user behavior and communications.

38. Some aspects of the operations of the Third Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of the Third Parties' cookies being transmitted from a Website user's device and browser to the Third Parties even after the user clicked or selected the "Decline All" button on the Website's Cookie Settings window:

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]


nvidia.com/en-us/geforce/graphics-cards/
NVIDIA
GeForce
Graphics Cards
GeForce RTX 40 Series
Learn More
GeForce RTX 30 Series
Learn More
Feedback
Elements Console Sources Network Performance
Preserve log
Disable cache
No throttling
Filter
Invert
Hide data URLs
Name
Domain
Cookies
Pug?vcode=bz0yJnR5cGU9MSZjb2R... image2.pubmatic.com 36
Pug?vcode=bz0yJnR5cGU9MSZjb2R... image2.pubmatic.com 36
setuid?entity=172&code=NjM5MG... ib.adnxs.com 7
setuid?entity=172&code=NjM5MG... ib.adnxs.com 7
trigger/?id=1617554146053258&ev=... www.facebook.com 6
tr/?id=1617554146053258&ev=Subsc... www.facebook.com 6
wa/ px.ads.linkedin.com 6
trigger/?id=1928711947357163&ev... www.facebook.com 6
tr/?id=1928711947357163&ev=Pag... www.facebook.com 6
trigger/?id=1617554146053258&ev=... www.facebook.com 6
tr/?id=1617554146053258&ev=Page... www.facebook.com 6
wa/ px.ads.linkedin.com 6
collect?v=2&fmt=js&pid=84497&ti... px.ads.linkedin.com 6
trigger/?id=1617554146053258&ev=... www.facebook.com 6
tr/?id=1617554146053258&ev=Subsc... www.facebook.com 6
wa/ px.ads.linkedin.com 6
trigger/?id=1617554146053258&ev=... www.facebook.com 6
tr/?id=1617554146053258&ev=Subsc... www.facebook.com 6
wa/ px.ads.linkedin.com 6
trigger/?id=1617554146053258&ev=... www.facebook.com 6
tr/?id=1617554146053258&ev=Subsc... www.facebook.com 6
wa/ px.ads.linkedin.com 6
wa/ px.ads.linkedin.com 6
trigger/?id=1928711947357163&ev... www.facebook.com 6
tr/?id=1928711947357163&ev=Pag... www.facebook.com 6
sync?nid=eyeota sync.srv.stackadapt.com 6
trigger/?id=1617554146053258&ev=... www.facebook.com 6
tr/?id=1617554146053258&ev=Page... www.facebook.com 6
wa/ px.ads.linkedin.com 6
collect?v=2&fmt=js&pid=84497&ti... px.ads.linkedin.com 6
collect?v=2&fmt=js&pid=84497&ti... px4.ads.linkedin.com 5
collect?v=2&fmt=js&pid=84497&ti... px4.ads.linkedin.com 5
RVXVWKJN7ZFAJEQ2WH4YF4?adrol... ipv4.d.adroll.com 4
in?id=id%3A560-NBS-753%26token... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
575 / 792 requests 754 kB / 8.4 MB transferred 19.9 MB / 38.4 MB resources


nvidia.com/en-us/geforce/graphics-cards/
NVIDIA
GeForce
Graphics Cards
GeForce RTX 40 Series
Learn More
GeForce RTX 30 Series
Learn More
Feedback
Elements
Console
Sources
Network
Performance
Preserve log
Disable cache
No throttling
Filter
Invert
Hide data URLs
Name
Domain
Cookies
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
RVXVWKJN7ZFAJEQ2WH4YF4?adrol... d.adroll.com 4
JUWZDLBKWFDCTN75AR2KST?adrol... d.adroll.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=173d... analytics.twitter.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=4ee2f... analytics.twitter.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=3b24... analytics.twitter.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=8817... analytics.twitter.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=8ae7... analytics.twitter.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=0d89... analytics.twitter.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=3dac... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=e93c... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=8e37... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=238c... analytics.twitter.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
imsync.ashx?pi=3644040318609260... ml314.com 4
RVXVWKJN7ZFAJEQ2WH4YF4?adrol... ipv4.d.adroll.com 4
in?id=id%3A560-NBS-753%26token... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
575 / 792 requests
754 kB / 8.4 MB transferred
19.9 MB / 38.4 MB resources


nvidia.com/en-us/geforce/graphics-cards/
NVIDIA
GeForce
Graphics Cards
GeForce RTX 40 Series
Learn More
GeForce RTX 30 Series
Learn More
Feedback
Elements
Console
Sources
Network
Performance
Preserve log
Disable cache
No throttling
Filter
Invert
Hide data URLs
Name
Domain
Cookies
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
out?adroll_fpc=07bc1c68bc659c317... d.adroll.com 4
RVXVWKJN7ZFAJEQ2WH4YF4?adrol... d.adroll.com 4
JUWZDLBKWFDCTN75AR2KST?adrol... d.adroll.com 4
adsct?bci=5&eci=2&event_id=dab1... analytics.twitter.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=c1cec... analytics.twitter.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=9dfe... analytics.twitter.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=6a27... analytics.twitter.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=3852... analytics.twitter.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=d45f... analytics.twitter.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=aad5... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=e64f... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=cba9... analytics.twitter.com 4
adsct?bci=5&eci=2&event_id=c397... analytics.twitter.com 4
adsct?bci=5&eci=3&event=%7B%7... analytics.twitter.com 4
iframe_content.html?adroll_fpc=07b... x.adroll.com 3
1041695361?random=17196038031... td.doubleclick.net 3
igs?advertisable=JUWZDLBKWFDCT... x.adroll.com 3
igs?advertisable=JUWZDLBKWFDCT... x.adroll.com 3
js_tracking?url=https%3A%2F%2Fw... tags.srv.stackadapt.com 3
trigger?fpc=07bc1c68bc659c31739e... x.adroll.com 3
tap.php?v=194538&nid=3644&put... pixel.rubiconproject.com 3
rum?cm_dsp_id=105&external_user_... dsum-sec.casalemedia.c... 3
sync?dsp_id=44&user_id=NjM5MG... x.bidswitch.net 3
saq_pxl?uid=8KPnb9mQLclHOmq2p... tags.srv.stackadapt.com 3
1041695361/?random=1719603823... googleads.g.doubleclick... 3
1041695361/?random=1719603823... googleads.g.doubleclick... 3
62d5c127677d11008e98da2b ws.zoominfo.com 3
events.js tags.srv.stackadapt.com 3
577 / 794 requests
755 kB / 8.4 MB transferred
19.9 MB / 38.4 MB resources


nvidia.com/en-us/geforce/graphics-cards/
NVIDIA
GeForce
Graphics Cards
GeForce RTX 40 Series
Learn More
GeForce RTX 30 Series
Learn More
Feedback
Elements
Console
Sources
Network
Performance
Preserve log
Disable cache
No throttling
Filter
Invert
Hide data URLs
Name
Domain
Cookies
pixel.gif?cs=22:1,20:1&fp=0771e169... aorta.clickagy.com 2
pixel.gif?cs=33:-1,37:1,48:-1,52:1,38:... aorta.clickagy.com 2
pixel?pid=r8hrb20&t=gif ps.eyeota.net 2
match?bid=tpm4omv&uid=nPqDLn... ps.eyeota.net 2
pixel.gif?clkgypv=jstag&ws=1 aorta.clickagy.com 2
data aorta.clickagy.com 2
xuid?mid=4714&xuid=NjM5MGU2Z... eb2.3lift.com 2
rtb-h?taboola_hm=NjM5MGU2ZDEy... sync.taboola.com 2
sync?_origin=1&uid=NjM5MGU2ZD... ups.analytics.yahoo.com 2
377928.gif?partner_uid=6390e6d124... idsync.rlcdn.com 2
delivery?client=nvidia&sessionId=36... nvidia.tt.omtrdc.net 1
etail api.nvidia.partners 1
ipv?_biz_r=https%3A%2F%2Fwww.n... cdn.bizible.com 1
retailer-newegg-ca.png assets.nvidia.partners 1
retailer-newegg.png assets.nvidia.partners 1
Micro-Center.png assets.nvidia.partners 1
memory-express-retailer-logo.png assets.nvidia.partners 1
retailer-canada-computers.png assets.nvidia.partners 1
retailer-costco.png assets.nvidia.partners 1
retailers_bestbuy_new.png assets.nvidia.partners 1
retailer-best-buy-ca.png assets.nvidia.partners 1
retailer-b-and-h.png assets.nvidia.partners 1
retailer-antonline-white.png assets.nvidia.partners 1
Amazon.png assets.nvidia.partners 1
loading16.gif www.nvidia.partners 1
nvidia-brand.css www.nvidia.partners 1
l0g045d8ns2k www.nvidia.partners 1
delivery?client=nvidia&sessionId=36... nvidia.tt.omtrdc.net 1
ipv?_biz_r=https%3A%2F%2Fwww.n... cdn.bizible.com 1
delivery?client=nvidia&sessionId=36... nvidia.tt.omtrdc.net 1
pr?.top=29134&action=Default%20... nvidiacorp.us-5.evergag... 1
act analytics.tiktok.com 1
act analytics.tiktok.com 1
act analytics.tiktok.com 1
cookie-sync?p=adroll&uid=NjM5M... sync.outbrain.com 1
sd?id=537103138&val=6390e6d124... us-u.openx.net 1
pixel analytics.tiktok.com 1
pixel analytics.tiktok.com 1
pixel analytics.tiktok.com 1
577 / 794 requests
755 kB / 8.4 MB transferred
19.9 MB / 38.4 MB resources




39. The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.nvidia.com. The screenshots depict only network traffic occurring ***after*** the user declined "All" cookies using the Cookie Settings window.

40. As shown above, despite the user's declination of "All" cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains such as www.facebook.com, td.doubleclick.net, analytics.tiktok.com, omtrcd.net, and many others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Website caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined all cookies and tracking technologies by clicking or selecting the "Decline All" cookies button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's declination of "All" cookies.

41. Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

42. As users interact with the Website, even after clicking or selecting the "Decline All" cookies button, more data regarding users' behavior and communications are intercepted by the Third Parties alongside the cookie data. This occurs despite users' rejection of unnecessary cookies and similar technologies for performance analysis, advertising, and the sale or sharing of personal information with third parties for such purposes. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These

Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

43. The Third Party code that the Website causes to be loaded and executed by the user's browser becomes a wiretap when it is executed because it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

## C. <u>The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendant's Website.</u>

### 1. The Website Causes the Interception of the Contents of Communications

44. The Website includes search bars and forms where users input information. For example, below is a screenshot of the search bar on the Website from approximately June 2024 where users could type into the search bar to cause the Website to search its contents:



45. When Plaintiffs and other Website users input the information into the search bar, they are intending to communicate with the Website the contents of the search to receive the information they are interested in.

46. Instead, the software on the Website causes the contents of the communication to be intercepted while in transit.

47. For example, the Website sends users' search strings to Facebook—even after consumers have declined all cookies. In the example below, the test string "privacy" was sent to Facebook along with cookie data:




### 2. Facebook Cookies

48. Defendant causes third-party cookies to be transmitted to and from Website users' browsers and devices to and from the **facebook.com** domain, even after users elect to "Decline All" non-strictly necessary cookies (including "Performance" and "Advertising" cookies). This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[3] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

49. Facebook's cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Website causes the following data to be sent to Meta when the user enters a search term into the Nvidia Website:

[3] https://www.facebook.com/privacy/policies/cookies/.

| Key | Value |
|---|---|
| id | 161755414605325 |
| ev | PageView |
| dl | https://www.nvidia.com/en-us/search/?page=1&q=privacy%20is%20important&sort=relevance |
| rl | https://www.nvidia.com/en-us/geforce/graphics-cards/ |
| if | false |
| ts | 1719604127695 |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.159 |
| r | stable |
| ec | 2 |
| o | 30 |
| cs_est | true |
| ler | empty |
| cdl | API_unavailable |
| it | 1719604025550 |
| coo | false |
| dpo | LDU |
| dpoco | 0 |
| dpost | 0 |
| rqm | GET |

50. The "ev" parameter is short for "event." In this instance, the event is a "PageView."

51. The "dl" parameter is the "Document Location." It tells Facebook the specific webpage on which the Event occurred – in this case, https://www.nvidia.com/en-us/search/?page=1&q=privacy%20is%20important&sort=relevance. This also discloses to Facebook the user's search query: "privacy is important."

52. The "ts" parameter corresponds to a "Timestamp," and tells Facebook the exact time—down to the millisecond—at which the user viewed the page.

53. The "sw" and "sh" parameters stand for "screen width" and "screen height," and correspond to the display the user was viewing when the event was recorded.

54. Cookies are sent along with all data transmissions to Meta. For instance, the following cookies were sent along with the AddToCart event:

**Request** Header Query Body Cookies Raw Summa

| Key | Value |
|---|---|
| sb | pQI9ZkmdCAXYrQSQXngSSMep |
| datr | pQI9Zu6rOGZxJLTz7YrqaTVV |
| c_user | 100076133960803 |
| ps_n | 1 |
| xs | 11%3Adi1FNrtx5ix0HA%3A2%3A171527441 0%3A-1%3A-1%3A%3AAcVh1547GCKJnGyv jMaUEMTJP0UrmrTFxLBsDo-pqw |
| fr | 1jvLdroEbqYmCRu9g.AWV2IzrhppEBpcTVNrh DCqlaQVU.Bmfvv1..AAA.0.0.BmfwGM.AWXx M7L0HEQ |

55. Defendant identified the fr cookie shown above as an "Advertising Cookie" used on the Website in the Cookie Policy and described its purpose as follows:

| | | | |
|---|---|---|---|
| fr | Persistent cookie (expires after 1 month) | Third party (Facebook) | Used by Facebook to enable ad delivery or retargeting. |

56. The c_user cookie shown above enables Facebook to identify a specific user when they are logged in to their account. The c_user cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience. Cookies enable Meta "to understand the information that [Meta] receive[s] about [users], including information about [user's] use of other websites and apps, whether or not [users] are registered or logged in."[4]

57. In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies allow Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[5]

---

[4] *Id.*

[5] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.

These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[6]

58. The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[7]

59. Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. Meta also states that "other companies' cookies help tailor ads off of Meta Products, measure their performance and effectiveness and support marketing and analytics."[8]This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

---

[6] https://allaboutcookies.org/what-data-does-facebook-collect.

[7] *Id.*

[8] Meta Cookies Policy, https://www.facebook.com/privacy/policies/cookies/.

60. Further, along with all of this data, the Facebook software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Facebook:

| | |
|---|---|
| user-agent | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/ 126.0.0.0 Safari/537.36 |

61. The "user-agent" corresponds to the device and browser that the user has used to access the Website.

62. Finally, the data sent to Facebook contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

### 3. Google Cookies

63. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users decline nonessential cookies to and from google-analytics.com; google.com; adservice.google.com; googleadservices.com; googlesyndication.com; and doubleclick.net domains.[9] Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[10] Website users' browsers automatically send Google their page URL and IP address.[11] Further, the Website permits Google to set cookies on the Website users' browsers and read cookies that are already there.[12] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of

---

[9] *See* Advertising (available at http://policies.google.com/technologies/ads).

[10] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[11] *See* How Google uses information from sites or apps that use our services (available at http://policies.google.com/technologies/partner-sites).

[12] *See* How Google uses information from sites or apps that use our services (available at http://policies.google.com/technologies/partner-sites).

web traffic is tracked by Google's DoubleClick cookies.[13] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[14]

64. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[15] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

65. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[16] "To measure a website … [one] add[s] a

---

[13] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[14] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[15] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

[16] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[17]

66. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[18]

67. Google's own Privacy & Terms materials provide that Google "store[s] a record of the ads we serve in our logs."[19] "These server logs typically include your web request, IP address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser or, if you are signed-in, that may uniquely

---

[17] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[18] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

[19] *See* Advertising (available at https://policies.google.com/technologies/ads?hl=en).

identify you."[20] Google then uses location information to infer the Website users' demographic information.[21]

68. Google's own Privacy & Terms materials provide that Google "store[s] a record of the ads we serve in our logs."[22] "These server logs typically include your web request, IP address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser or, if you are signed-in, that may uniquely identify you."[23] Google then uses location information to infer the Website users' demographic information.[24]

69. For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at https://www.googleads.g.doubleclick.net:

[20] *Id.*

[21] *Id.*

[22] *See* Advertising (available at https://policies.google.com/technologies/ads?hl=en).

[23] *Id.*

[24] *Id.*

GET
200

https://googleads.g.doubleclick.net
4025741&cv=11&fst=171960402574l&bg=
13131313ll&dma=0&tag_exp=0&u_w=1920
arch%2F%3Fpage%3D1%26q%3Dprivacy%26
us%2Fgeforce%2Fgraphics-cards%2F&hn=w

Request Header Query Body Cookies Raw Summary

| Key | Value |
|---|---|
| gtm | 45be46q0v885977293za200 |
| guid | ON |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| random | 1719604025741 |
| ref | https://www.nvidia.com/en-us/geforce/graphics-cards/ |
| rfmt | 3 |
| tag_exp | 0 |
| tiba | Onsite Search: Find What You Seek \| NVIDIA |
| u_h | 1080 |
| u_w | 1920 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%2FA)Brand;8.0.0.0\|Chromium;126.0.6478.127\|Google%20Chrome;126.0.6478.127 |
| uam | |
| uamb | 0 |
| uap | Windows |
| uapv | 10.0.0 |
| uaw | 0 |
| url | https://www.nvidia.com/en-us/search/?page=1&q=privacy&sort=relevance |
| userId | replace with value |

70. The "npa" parameter refers to "Non-Personalized Ads." When npa is set to 1, it indicates non-personalized ads preference is enabled. Here, npa is set to 0, indicating that standard (personalized) ads are enabled.

71. The "url" and "tiba" parameters disclose to Google the exact webpage and title that the user was viewing. In this instance, the url discloses the search string the user entered on the website: "privacy."

72. The "u_h" and "u_w" parameters correspond to the user's screen height and width.

73. Along with this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the following cookies to be sent to Google's domain:




74. Google documentation confirms that the IDE cookie is used for advertising. Specifically, it is "used to show Google ads on non-Google sites."[25]

75. Defendant identified Google's IDE cookie as an "Advertising Cookie" used on the Website in the Cookie Policy and described its usage as follows:

| | | | |
|---|---|---|---|
| IDE | Persistent cookie (expires after 1 year) | Third party (doubleclick) | Used by Google DoubleClick to register and report the website user's actions after viewing or clicking one of the advertiser's ads with the purpose of measuring the efficacy of an ad and to present targeted ads to the user. |

76. Further, along with all of this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google:

[25] https://policies.google.com/technologies/cookies?hl=en-UST

| | |
|---|---|
| user-agent | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/ 126.0.0.0 Safari/537.36 |

77. As discussed above with respect to Facebook, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

78. Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

79. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google states that when users visit sites or apps using Google's ad or analytics services, "those services may link information about your activity from that site or app with activity from other sites or apps that use our services."[26] Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

80. Google's consumer profiles span across the user's devices and across households.[27] Google states that it "may infer whether activity from different devices, browsing sessions, or accounts is associated," and links mobile advertising IDs to advertising cookies "to coordinate ads across [users'] mobile apps and mobile browser."[28] Users may then receive ads on household connected TVs related to the web or app activity from devices within their household.[29]

81. Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads

[26] *See* Why Google collects data (available at https://policies.google.com/privacy?fg=1&hl=en-GB).

[27] *See* Advertising (available at https://policies.google.com/technologies/ads?hl=en).

[28] *Id.*

[29] *Id.*

across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as rebranding their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[30]

82. Defendant described the purpose of Google's cookies as follows in the Website Google Policy:

> This domain is owned by Google Inc. Although Google is primarily known as a search engine, the company provides a diverse range of products and services. Its main source of revenue however is advertising. Google tracks users extensively both through its own products and sites, and the numerous technologies embedded into many millions of websites around the world. It uses the data gathered from most of these services to profile the interests of web users and sell advertising space to organisations based on such interest profiles as well as aligning adverts to the content on the pages where its customer's adverts appear.

83. Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power

[30] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[31] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**4. TikTok Cookies**

84. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to decline cookies, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok USDS Joint Venture LLC.. The TikTok social media platform is used to create and share short-form videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[32]

85. TikTok utilizes analytics.tiktok.com cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[33] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to recognize and track users across different sessions and

---

[31] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[32] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[33] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

domains (i.e., cross-site tracking) and to collect and synchronize user data to observe and evaluate TikTok user behavior.

86. These cookies enable TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address.[34]

87. For example, the TikTok software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to TikTok's domain, at https://analytics.tiktok.com:




[34] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

```
      responsivegrid/nv_container_1965276/nv_teaser_copy.
      coreimg.100.410.jpeg/1694172071136/
      geforce-gtx-16-series.jpeg\"},\"subscopes\":[],
      \"type\":\"http://schema.org/ImageObject\"}]",
      "open_graph": "{\"og:site_name\":\"NVIDIA\",
      \"og:type\":\"Website\",\"og:url\":\"https://www.nvidia.
      com/en-us/geforce/graphics-cards/\",
      \"og:title\":\"NVIDIA GeForce Graphics Cards\",
      \"og:description\":\"GeForce RTX 40, 30, 20 series &
      GTX 16 series.\",\"og:image\":\"https://www.nvidia.com/
      content/dam/en-zz/Solutions/geforce/ada/graphics-cards/
      geforce-ada-4090-web-og-1200x630@2x.jpg\",
      \"twitter:card\":\"summary_large_image\",
      \"twitter:site\":\"@NVIDIA\",
      \"twitter:creator\":\"@NVIDIAGeForce\",
      \"twitter:title\":\"NVIDIA GeForce Graphics Cards\",
      \"twitter:url\":\"https://www.nvidia.com/en-us/geforce/
      graphics-cards/\",\"twitter:description\":\"Explore
      NVIDIA GeForce graphics cards. RTX 40 series, RTX 30
      series, RTX 20 series and GTX 16 series.\",
      \"twitter:image\":\"https://www.nvidia.com/content/dam/
      en-zz/Solutions/geforce/ada/graphics-cards/
      geforce-ada-4090-web-og-1200x630@2x.jpg\"}"
    },
    "page_trigger": "Click"
  },
  "context": {
    "ad": {
      "jsb_status": 2,
      "sdk_env": "external"
    },

    "device": {
      "platform": "pc"
    },
    "index": 0,
    "library": {
      "name": "pixel.js",
      "version": "2.2.0"
    },
    "page": {
      "load_progress": "2",
      "referrer": "https://www.nvidia.com/en-us/",
      "url": "https://www.nvidia.com/en-us/geforce/
      graphics-cards/"
    },
    "pageview_id": "pageId-1719603824484-7435376964767.0.0",
    "pixel": {
      "code": "C2V17UTEERJ9G00M6RM0",
      "codes": "C2V17UTEERJ9G00M6RM0|C2DMTL2QV140ORDIK620",
      "runtime": "1"
    },
    "session_id":
    "b9e54b2f-3586-11ef-9b9c-02001704b732::qPUPoWVZXShfn0PbXsQ
    n",
    "user": {
      "anonymous_id": "D4fWm7WF0wA1gaYuUAr8QYaOdmd"
    },
    "userAgent": "Mozilla/5.0 (Windows NT 10.0; Win64; x64)
    AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.0.0
    Safari/537.36",
    "variation_id": "test_2_single_track"
  },
```

```
  "event_id": "",
  "is_onsite": false,
  "message_id": "messageId-1719604002911-6453556665542",
  "properties": {},
  "signal_diagnostic_labels": {
    "hashed_email": {
      "label": "missing"
    },
    "hashed_phone": {
      "label": "missing"
    },
    "raw_auto_email": {
      "label": "missing"
    },
    "raw_auto_phone": {
      "label": "missing"
    },
    "raw_email": {
      "label": "missing"
    },
    "raw_phone": {
      "label": "missing"
    }
  },
  "timestamp": "2024-06-28T19:46:42.911Z"
}
```


88. The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[35]

89. The data discloses extensive information to TikTok regarding the user's activity on the Website. For example, the "meta" attribute discloses the title of the webpage, as well as keywords relevant to the webpage. The "microdata" attribute discloses the images that the user viewed on the webpage--down to their exact filenames and dimensions. The "page.url" attribute discloses the url of the webpage the user is viewing (here, https://www.nvidia.com/en-us/geforce/graphics-cards). The data also discloses the exact time this action occurred, down to the millisecond.

[35] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

90. Along with this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the "_ttp" cookie to be sent to TikTok's domain:




91. According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[36]The "_ttp" cookie is created and owned by TikTok on TikTok's server and is used to recognize and match events across different websites, is enabled by default, and lasts 13 months from the last date it was used.[37]

92. Further, along with all of this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok:

| | |
|---|---|
| user-agent | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.0.0 Safari/537.36 |

As discussed above with respect to Facebook, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

93. Finally, the data sent to TikTok includes the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

---

[36] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[37] TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel).

94. By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyze user responses to ads and content).[38]

95. Further, TikTok's marketing materials provide that its Automatic Advanced Matching feature allows advertisers to use cookies to "[m]atch your website visitors with people on TikTok, to expand audience sizes for solutions like web retargeting."[39] TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. TikTok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[40]

### 5. Adobe Cookies

96. Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users choose to "Decline All" cookies including all Performance and Advertising cookies and/or to toggle off "Performance Cookies" and "Advertising Cookies," to and from the **omtrdc.net** domain and the Adobe-owned-and-hosted **smetrics.nvidia.com** domain. These domains are associated with Adobe Inc.'s Audience Manager, a data management platform, Adobe's Marketing Cloud, and Adobe's Experience Cloud Identity Service, a service which provides a universal, persistent

---

[38] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[39] TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel).

[40] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).

ID to identify visitors across all Adobe products. Defendant described the function of Adobe cookies as follows in its Website Cookie Policy: "This domain is owned by Adobe Audience Manager. The main business activity is online profiling for targeted advertising."

97. These cookies are used to assign a unique identifier to each site visitor, which enables Adobe to consistently recognize and track users across different sessions and domains (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and evaluate user behavior online.[41] These cookies enable Adobe to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) interests and preferences; and (vi) session information.[42]

98. Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics, create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[43]

99. For example, the Adobe software code that Defendant causes to be stored on and executed by the Website user's device causes the following query string and cookie data to be sent to Adobe's domain, at https://nvidia.tt.omtrdc.net:

---

[41] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics); *see also* Adobe Experience League: Audience Manager cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager).

[42] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).

[43] *See, e.g.*, Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).







100. The “sessionId” key is designed to persist during the entirety of the user’s visit, enabling Adobe to link the user’s pageviews across the website.

101. According to Adobe documentation, the cookie beginning in “s_vi” “[s]tores a unique visitor ID and timestamp.”[44] “Each visitor ID is associated with a visitor profile on Adobe servers,” and visitor profiles are set to persist for one year.[45]

102. Defendant identifies the cookie beginning in “s_vi” as a “Performance Cookie” in its Website Cookie Policy and describes this cookie as follows:

| | | | |
|---|---|---|---|
| s_vi_cx7Bilodaaoblx7Fi | Persistent cookie (expires after 2 years). | Third Party (omtrdc.net) | This domain is owned by Adobe and is used to provide website analytics and optimisation services to clients. |

103. Likewise, the following type of data is sent to Adobe’s domain at https://smetrics.nvidia.com after users have rejected all cookies:

---

[44] https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics.

[45] *Id.*

GET
200

```
https://smetrics.nvidia.com/b/ss/nvdaglobalprod/1/JS-
8%205%20420&mid=20265760501848647141206737764232151401
tps%3A%2F%2Fwww.nvidia.com%2Fen-us%2Fsearch%2F%3Fpage
D%3Dv10&v10=search%3Arepeat%3Asuccess%3Aprivacy%20is%
important&pe=lnk_o&pev2=search%3Arepeat%3Asuccess%3Apriv
```

**Request** Header Query Body Cookies Raw | Summary +

| Key | Value |
|---|---|
| AQB | 1 |
| ndh | 1 |
| pf | 1 |
| t | 28/5/2024 12:48:48 5 420 |
| mid | 20265760501848647141206737764232151401 |
| ce | UTF-8 |
| ns | nvda |
| cdp | 2 |
| fpCookieDomainPeriods | 2 |
| pageName | nv:search |
| g | https://www.nvidia.com/en-us/search/?page=1&q=privacy&sort=relevance |
| cc | USD |
| events | event10,event21 |
| c10 | D=v10 |
| v10 | search:repeat:success:privacy is important:nv:search |
| c20 | privacy is important |
| v20 | privacy is important |
| pe | lnk_o |
| pev2 | search:repeat:success:privacy is important:nv:search |
| s | 1920x1080 |
| c | 24 |
| j | 1.6 |
| v | N |
| k | Y |
| bw | 708 |
| bh | 953 |
| mcorgid | F207D74D549850760A4C98C6@AdobeOrg |
| lrt | 44 |
| AQE | 1 |

104. Along with that data, the following extensive cookie data are sent to Adobe's smetrics.nvidia.com domain:

GET
200

https://smetrics.nvidia.com/b/ss/nvdaglobalprod/1/JS-
8%205%20420&mid=202657605018486471412067377642321514
tps%3A%2F%2Fwww.nvidia.com%2Fen-us%2Fsearch%2F%3Fpage
D%3Dv10&v10=search%3Arepeat%3Asuccess%3Aprivacy%20is%
important&pe=lnk_o&pev2=search%3Arepeat%3Asuccess%3Apri

**Request** Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| at_check | true |
| nvweb_A | cd38578a-f088-4581-9680-46911a61a2f3 |
| s_ecid | MCMID%7C20265760501848647141206737764232151401 |
| AMCVS_F207D74D549850760A4C98C6%40AdobeOrg | 1 |
| AMCV_F207D74D549850760A4C98C6%40AdobeOrg | 179643557%7CMCMID%7C20265760501848647141206737764232151401%7CMCAID%7CNONE%7CMCOPTOUT-1719610956s%7CNONE%7CvVersion%7C5.5.0 |
| _cs_mk | 0.5887334763189811_1719603756629 |
| ak_bmsc | A391E86637DEAF2A3DDB3DFBAF98B206~000000000000000000000000000000~YAAQzunHF93mMFSQAQAAfQBfYBj7cWyau9Ark/h1ZpgkgvhoZnwgt7SyRCsS2z2CRZqKaUaKygYFly0oGOopLWRzD6A5Oul0opPpwX4k5gXedtF+veNlPxoBecXZ/FNSj+rVJilbHJqXjbJX+TCYZZ++rXkS85TEFhORy7i9n8iDeqv+jk1doYy6P+sfHk9p6mnz7BElvhto8Be8XOsDmx5u+/UrPQqmQyQ/ytnZ45bdVT+b8CJRYEr5mbflwiNSPNowU7qyiehOafd8mnRhqtud6TaNgT4vfplXU7oA+FCyPjpEntkaok5RwWd1CxbbkSUjbUGrv6w3QXHOvYMZK0Vooz5GxP07nhJZJ2JhMMRZ2lI5ClrIJAnLp9l/Et1iQQexRYISOpThNmN2AuVsBoVtHPe8kv4g |
| _gcl_au | 1.1.116464114.1719603758 |
| s_cc | true |
| _cs_c | 0 |
| _hjSession_3655182 | eyJpZCI6ImY1NTlhMWVmLTYwNjMtNDkyYi1hYzhlLTQ0NTljZTgyNDliZCIsImMiOjE3MTk2MDM3NTc3NTksInMiOjAsInliOjAsInNiljowLCJzcil6MCwic2UiOjAsImZzIjoxLCJzcCI6MX0= |
| _vwo_uuid_v2 | D8F250E0294AEE4C042C3396214604F39\|cc6ef2cb8b04477f62d37d2396d0188c |
| _biz_uid | 09bed99a73f0459cefb5bfc708c4fcd6 |
| _hly_vid | 02dd56f0-104e-418e-b9a9-7435093846eb |
| _vis_opt_s | 1%7C |
| _vis_opt_test_cookie | 1 |
| _biz_flagsA | %7B%22Version%22%3A1%2C%22Ecid%22%3A%22-621273206%22%2C%22ViewThrough%22%3A%221%22%2C%22XDomain%22%3A%221%22%2C%22Mkto%22%3A%221%22%7D |
| _fbp | fb.1.1719603758548.124930743920596034 |
| OptanonConsent | isGpcEnabled=0&datestamp=Fri+Jun+28+2024+12%3A43%3A14+GMT-0700+(Pacific+Daylight+Time)&version=202304.1.0&browserGpcFlag=0&isIABGlobal=false&hosts=&consentId=30953c2d-2299-40ee-a4d5-36bd8214f436&interactionCount=1&landingPath=https%3A%2F%2Fstore.nvidia.com%2Fen-us%2Fconsumer%2F%3Fpage%3D1%26limit%3D9%26locale%3Den-us%26gpu%3DRTX%25204090%2CRTX%25204080%2CRTX%25204070%2520Ti%2CRTX%25204070%2CRTX%25204060%2520Ti%2CRTX%25204060%2CRTX%25204070%2520SUPER%2CRTX%25204070%2520Ti%2520SUPER%2CRTX%25204080%2520SUPER%26category%3DGPU%2CDESKTOP&groups=C0001%3A1%2CC0002%3A1%2CC0004%3A1%2CC0003%3A1 |

| | |
|---|---|
| _hjSessionUser_3655182 | eyJpZCI6IjEzNGIwYjRjLTUxODYtNWQ3Ny04MDgxLTAxNDA3YjI4NGYzYSIsImNyZWF0ZWQiOjE3MTk2MDM3NTc3NTgsImV4aXN0aW5nIjp0cnVlfQ== |
| _evga_7830 | {%22uuid%22:%224ef9d671315ab74b%22} |
| _sfid_eb78 | {%22anonymousId%22:%224ef9d671315ab74b%22%2C%22consents%22:[{%22consent%22:{%22purpose%22:%22Personalization%22%2C%22provider%22:%22Consent%20Manager%22%2C%22status%22:%22Opt%20In%22}%2C%22lastUpdateTime%22:%222024-06-28T19:43:43.817Z%22%2C%22lastSentTime%22:%222024-06-28T19:43:43.843Z%22}]} |
| _tt_enable_cookie | 1 |
| _ttp | D4fWm7WF0wA1gaYuUAr8QYaOdmd |
| _rdt_uuid | 1719603757017.79e975f8-8a0a-47f9-a8f3-b2bbc2697b47 |
| s_getNewRepeat | 1719604024966-New |
| bm_sv | AB5DB0ACA910536C883325CE1A4059D3~YAAQBE5DF52/AWCQAQAACRdjYBhKPd6mvN2b4sn1mzVxUUa4Dkom2kEfGtCJ3Pd444O0/aZ++7JXj7Yp//TTx5KK/FTmgrySxWAgmZ1pRlRcqFVlSXC1q8i6xrHeOXO1afds/QrAg3AckUwPvyYUiAsu2uQddp9TbZ3VDmIxPiMA8vIzeu4nhGBEQZuFpqJNmZFsbNef+3ZI2wdMxZ/deycnH+GJqhKhjRRoFqoyvkS2RyQBohstkk171LSGIhDruw==~1 |
| _cs_id | 8a9da34f-cd03-ae58-d965-895f6f992475.1719603757.1.1719604025.1719603757.1.1753767757716.1 |
| _cs_s | 7.0.0.1719605825483 |
| _mkto_trk | id:156-OFN-742&token:_mch-nvidia.com-1719603757778-66299 |
| _biz_nA | 10 |
| _biz_pendingA | %5B%5D |
| tp | 3740 |
| s_ppv | nv%253Asearch%2C25%2C25%2C953 |
| s_sq | %5B%5BB%5D%5D |
| mbox | session#367b391332cf45e19c441e6cd60146ba#1719605988\|PC#367b391332cf45e19c441e6cd60146ba.35_0#1782848928 |

105. Further, both Adobe domains receive the user's IP address and user-agent information, along with each request.

### 6. LiveRamp Cookies

106. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users click or select the "Decline All" button and/or toggle off "Performance Cookies" and "Advertising Cookies," to and from the **rlcdn.com** domain.[46] This domain is associated with LiveRamp, a software company that allows businesses to combine customer data from various online and offline sources and

[46] *See* https://docs.liveramp.com/identity/en/implementing-liveramp-s-cookie-sync-tag.html and https://docs.liveramp.com/connect/en/announcing-required-pixel-changes--7-2-19-.html.

leverage that data for marketing and analytics purposes.[47] Rlcdn.com cookies are used to create an online identification code for the purpose of recognizing users' devices and tracking their user behavior.

107. Defendant identified these cookies as "Advertising Cookies" in the Website Cookie Policy and described its purposes as follows:

| | | | |
|---|---|---|---|
| rlas3 | Persistent cookie (expires after 1 year) | Third Party (rlcdn.com) | This cookie is used to deliver advertising more relevant to you and your interests. It is also used to limit the number of times you see an advertisement as well as help measure the effectiveness of the advertising campaign. |

108. These cookies enable LiveRamp to obtain and store at least the following user data: browsing history, visit history, website interactions, user input data (such as email address), demographic information, interests and preferences, device information, user identifiers, and geolocation data (including IP addresses), on the Website. The unique user identifier enables LiveRamp to sell a user's unique data for use in online and cross-channel advertising (including to enable third parties to link profiles and across browsers and devices for targeted advertising and email marketing).[48] LiveRamp also "collects social security numbers and driver's license numbers" for identity resolution and enables "appending 2nd- and 3rd-party data sets" to customer lists.[49]

109. LiveRamp explains in its Privacy Notice the user data it receives from cookies installed on "partner websites" and how it uses (and monetizes) that data as follows:

> [The website] partner may sell or share personal information collected from you, such as your email, cookies set on your browser, IP address, or information about your browser or operating system, with LiveRamp. LiveRamp uses this information to create an online identification code for the purpose of recognizing your device. This code may be placed in our partners' cookie and for use in online and cross-channel advertising (including targeted advertising and email marketing), or LiveRamp may connect it to LiveRamp's own 3rd-party cookie and other identifiers. In addition, by associating an email address with a cookie, LiveRamp and third parties can link your

[47] See https://liveramp.com/privacy/service-privacy-policy/#section1a; *see also* LiveRamp Data Marketplace (available at https://liveramp.com/data-marketplace/).

[48] LiveRamp Product and Service Privacy Notice (updated Aug. 12, 2026) (available at https://liveramp.com/privacy/service-privacy-policy/)

[49] *Id.*

> browsing activity across different websites and other applications and services to your specific device associated with the email address, identifying the user behind the device. This means that, even when browsing unrelated sites, your online activity can be connected to you for advertising and other marketing-related purposes, including email marketing and offline advertising...
>
> The personal data and identifiers we collect (for instance, a cookie ID) may be linked to other personal data and identifiers through known associations and/or identity resolution (for instance, an identifier derived from or associated with a hashed email address and LiveRamp cookie 1234 might be associated with partner cookie 5678), and shared with advertising partners and other third party advertising companies for the purpose of enabling interest-based content or targeted advertising throughout your online and offline experiences (e.g., web, TV [MVPDs], connected TV, mobile applications, email marketing and other media). These third parties may in turn use this identifier to link demographic or interest-based information you have provided in your interactions with them. Note that LiveRamp does not itself provide the service of targeted advertising (sometimes referred to as "cross-context advertising") but, rather, processes and transfers data to an advertiser's advertising platform so that platform can provide targeted advertising services...[50]

### 7. Taboola Cookies

110. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users click or select the "Decline All" button and/or toggle off "Performance Cookies" and "Advertising Cookies," to and from the **taboola.com** domain.[51] This domain is associated with Taboola, Inc., "one of the world's leading performance advertising platforms for the open web. Through our exclusive partnerships with many of the world's top websites, we help advertisers engage with over 600 million unique daily active users."[52] "Taboola's platform is powered by Deep Learning technology that uses Taboola's unique data about people's interests and information consumption to recommend the right content to the right person at the right time."[53] Taboola's technology learns user engagement patterns by analyzing data it collects using cookies about user "reading preferences, browsing history, device, location, time of day and more..."[54]

---

[50] *Id.*

[51] *See* LiveRamp Product and Service Privacy Notice (available at https://liveramp.com/privacy/service-privacy-policy/).

[52] *See* https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works#.

[53] *Id.*

[54] *Id.*

111. Taboola cookies enable it to obtain and store at least the following user data: user identifiers, browsing history, visit history, website interactions, user input data (such as email addresses), demographic information (such as gender and age), interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers (i.e., "cookie IDs"), and/or geolocation data.[55] This data allows Defendant to target its advertising campaigns to users based on user "location, time, browser type, connection type, audience segments, and more."[56]

112. For example, the Taboola software code that Defendant causes to be stored on and executed by the Website user's device causes the following cookie data to be sent to Taboola's domain, at sync.taboola.com:




113. According to Taboola documentation, the "t_gid" cookie "[a]ssigns a unique, User ID that Taboola uses for attribution and reporting purposes, and to tailor recommendations to this specific user based on interactions with an advertiser or publisher."[57] The cookie stays on the consumer's device and does not expire for an entire year.[58]

---

[55] Taboola Privacy Policy (available at https://www.taboola.com/policies/privacy-policy#information-we-collect-from-users-user-information); *see also* Taboola Cookie Policy (available at https://www.taboola.com/policies/cookie-policy).

[56] *See* https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works#; *see also* https://help.taboola.com/hc/en-us/articles/115001936293-Targeting-Marketplace-Audiences#.

[57] https://www.taboola.com/policies/cookie-policy.

[58] *Id.*

114. Taboola explains in its Privacy Policy the user data it receives from cookies installed on its customers' (such as Defendant) websites and how it uses (and monetizes) that data to create audience segments as follows:

> We use User Information for the following purposes: … **Offering our Customers data segments that help target content and advertisements for topics, products, and services that may interest you.** A data segment is a grouping of users who share one or more attributes (e.g., travel enthusiasts). We offer a number of data segments, both proprietary and from our data partners, to our Customers so that they may better target Users who are more likely to be interested in their content and advertisements. Taboola does not knowingly create segments that are based upon what we consider to be sensitive information (for example, Personal Data revealing your racial or ethnic origin or your religious affiliations, or Personal Data concerning your sensitive health information, sex life or sexual orientation, or genetic or biometric data). In connection with our Services, our Customers may use these standard health-related segments about non-sensitive conditions such as an inferred interest in health and wellness or over the counter medications. In addition, Taboola offers our Customers standard political-related segments that may indicate general political sentiment, interest in specific political issues, and political party affiliation.[59]

Taboola identifies unique users across devices, and syncs cookies and identifiers with service providers that identify unique users, to target users with advertisements.[60] Taboola states in its Privacy Policy that it may "disclose User Information to other unaffiliated third parties" such as "data partners" and "programmatic demand and supply partners" in order to connect users with "relevant content" and "tailored advertisements."[61]

**8. Salesforce Cookies**

115. Defendant also causes data and cookies to be transmitted to and from Website users' browsers and devices, even after users elect to disable all cookies (including "Advertising" cookies), to and from the evergage.com domain, which points to Salesforce's Interaction Studio product. Salesforce describes that product as follows:

---

[59] Taboola Privacy Policy (available at https://www.taboola.com/policies/privacy-policy#information-we-collect-from-users-user-information) (emphasis in original).

[60] Taboola Privacy Policy (updated Sept. 17, 2026) (available at https://www.taboola.com/policies/privacy-policy).

[61] *Id.*

> Interaction Studio enhances the power of Marketing Cloud with expanded real-time personalization. Companies use Interaction Studio to tailor interactions with customers and prospects to increase loyalty, engagement, and conversions. Using real-time cross-channel personalization and machine learning capabilities, Interaction Studio complements Marketing Cloud's robust customer data, audience segmentation, and engagement platform.[62]

116. For instance, Defendant has configured the Nvidia Website to send the following query string and cookie data to be sent to nvidiacorp.us-5.evergage.com, which is hosted by Salesforce:







117. This data informs Salesforce of the exact product that the user was viewing on the Website. The data also includes an ".anonId," which is an identifier used to uniquely track the user throughout all interactions with the Website.

---

[62] https://help.salesforce.com/s/articleView?id=sf.mc_isev_interaction_studio.htm&type=5.

118. In addition, Defendant causes the user's user-agent and IP address information to be sent to Salesforce.

**9. Additional Third Party Cookies**

119. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Decline All" cookies, including all Performance and Advertising cookies to and from other domains, including pubmatic.com; ib.adnxs.com; px.ads.linkedin.com; analytics.twitter.com; ps.eyeota.net; analytics.yahoo.com; adroll.com; rubiconproject.com; casalemedia.com; bidswitch.net; 3lift.com; outbrain.com; and openx.net.

120. The **pubmatic.com** domain (and its subdomains) is associated with PubMatic, Inc., a digital advertising company.[63] PubMatic uses pubmatic.com cookies to collect data on user behavior on websites including user interactions with advertising content.[64] PubMatic uses this data to personalize advertising content and track users across the internet.[65] Defendant identified pubmatic cookies as "Advertising Cookies" in the Website's Cookie Policy and described their purpose as follows:

| | | | |
|---|---|---|---|
| KRTBCOOKIE_xxxx | Persistent cookie (expires after 90 days) | Third Party (pubmatic.com) | This cookie is used to correlate IDs with those of Pubmatic partners (such as demand side platform clients or other advertising technology companies). Pubmatic passes information stored by the partner in this cookie to the partner when it is considering whether to purchase advertisements. This enables the partner to make better decisions about whether to display an advertisement to you. |

121. The **adnxs.com** domain is associated with AppNexus, owned by Microsoft. Microsoft uses adnxs.com cookies to collect data on user navigation and behavior on websites, including information on user preferences and/or interaction with web-campaign content, to target advertisements.[66] The cookies include unique identifiers that help Microsoft

[63] *See* www.metrixlab.com.

[64] *See* PubMatic, Inc. Form 10-K for year ending December 31, 2023 (Filed February 28, 2024) at 17–18.

[65] *Id.*

[66] https://cookiepedia.co.uk/host/adnxs.com.

recognize users across different websites and sessions.[67] This allows cookies set from the adnxs.com domain to collect data, including IP address, user demographic information, geographic location, page views, and interactions with websites.[68] These cookies also enable Household Attribution, a feature that enables Microsoft to match ads served on any device to website activity occurring on any device connected to the same network using the same IP address.[69] Further, the cookies enable advertisers to track the effectiveness of campaigns and avoid showing the same ads repeatedly to the same users. Microsoft uses this data to personalize ad content and track users across the internet. Adnxs.com cookies also categorize users into different segments based on their interests, demographics, or behaviors. This segmentation is used to target specific audiences with tailored ads. The data collected by cookies set through the adnxs.com domain has allowed Microsoft to set up a platform in which advertisers can bid for and place advertisements targeted at users based on a variety of demographics, including, among other things, demography, device type, and location.[70]

122. The **linkedin.com** domain is owned by LinkedIn Corporation—a subsidiary of Microsoft Corp. LinkedIn Corporation runs the social media-based business networking platform LinkedIn. Cookies set by the linkedin.com domain are used to target website users with advertising.[71] Defendant identified LinkedIn cookies as "Advertising Cookies" in the Website Cookie Policy and described its usage as follows:

---

[67] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json.

[68] *Id.*; https://www.microsoft.com/en-us/privacy/privacystatement#mainpersonaldatawecollectmodule.

[69] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json.

[70] https://learn.microsoft.com/en-us/xandr/monetize/buy-side-targeting#other-targeting-guidance.

[71] https://cookiepedia.co.uk/host/linkedin.com.

> This domain is owned by LinkedIn, the business networking platform. It typically acts as a third party host where website owners have placed one of its content sharing buttons in their pages, although its content and services can be embedded in other ways. Although such buttons add functionality to the website they are on, cookies are set regardless of whether or not the visitor has an active Linkedin profile, or agreed to their terms and conditions. For this reason it is classified as a primarily tracking/targeting domain.

123. Linkedin explains its cookies are used to target users with advertising and measure the performance of such ads.[72] These cookies assign a unique ID to users' devices, which allows LinkedIn to track users across the internet, and to collect information regarding IP address, operating system, browser information, web browsing activity—including the URL of both the site the users came from before accessing the website with the linkedin.com cookies and the one to which users navigate when they leave the website with the linkedIn.com cookies—download and purchase activity, and how users interact with ads.[73] Cookies set by the linkedIn.com domain are used to target users with advertisements on and off the LinkedIn social media platform.[74].

124. The **twitter.com** domain is associated with X Corp, formerly known as Twitter. X Corp's cookies collect a wide range of user data, including a user's browsing history; IP address; interactions with advertisements; data used to authenticate and secure personal accounts; and reading a device's local storage.[75] Defendant identified Twitter cookies as "Advertising Cookies" in the Website Cookie Policy that are "primarily used for tracking and targeting." X Corp uses the collected user data to target users with personalized

---

[72] https://www.linkedin.com/legal/cookie-policy.

[73] *Id.*

[74] *Id.*

[75] *See* https://help.x.com/en/rules-and-policies/x-cookies.

advertisements and content, generate analytics on website interaction, and to conduct unspecified "Research and Development."[76]

125. The **ps.eyeota.net** domain is associated with Eyeota, a subsidiary of Dun & Bradstreet, a "Leading Business Data Analytics" firm.[77] Eyeota's cookies collect data associated with a user's browser history, as well as anything a visitor interacts with on a particular website page. Eyeota uses the collected data to target users with personalized advertisements, as well as collate data to sell to other businesses to help companies drive growth, manage risk, and strengthen the performance of their business. Defendant identified Eyeota cookies as "Advertising Cookies" in its Website Cookie Policy and described them as "This domain is owned by Eyeota, a global company specialising in audience data to enable targeting of advertising based on visitor profiling."

126. The **yahoo.com** domain is owned by Yahoo Inc., a technology company that focuses on online media and advertising. Cookies set by the yahoo.com domain are used to target website users with advertising by assigning Website users unique identifiers.[78] These cookies collect information, such as IP addresses, browser type and settings, operating system, device type, and advertising identifiers from other third parties, including Apple's ID for Advertising, Apple's ID for vendors, Google's Android ID, and Google's Play Store Ad ID.[79] Cookies are further used to support Yahoo's targeting of content and advertising and to associate users, devices, and accounts with each other or with those in a similar location, such as in the same household.[80] Yahoo's use of a unique identifier with its cookies allows it to track users across the internet and across different devices.[81] The purpose of Yahoo Inc.'s

---

[76] *Id.*

[77] Dun & Bradstreet solutions (available at https://www.dnb.com/).

[78] https://cookiepedia.co.uk/host/yahoo.com

[79] https://legal.yahoo.com/us/en/yahoo/privacy/topics/cookies/index.html#:~:text=When%20you%20log%20in%20to,or%20device%20you%20are%20using.

[80] *Id.*

[81] *Id.*

cookies and the data they collect is to track users and target them with advertisements—the sale of which Yahoo uses to generate revenues. Defendant identified Yahoo cookies as "Advertising Cookies" in its Website Cookie Policy and described its main business activity as "Search / Advertising."

127. The **adroll.com** domain is associated with AdRoll, a digital advertising platform owned by NextRoll, Inc.[82] AdRoll uses cookies to perform retargeting, a practice that involves tracking users who have previously visited a client's website and serving them personalized advertisements on other websites across the internet.[83] These cookies collect data on user browsing activity, website interactions, and cross-device behavior to build user profiles for interest-based advertising campaigns.[84] AdRoll's technology, through cookies such as_adroll and _adroll_shared, assigns unique identifiers to users to facilitate this tracking and ad delivery across multiple platforms and devices, enabling a persistent view of a user's activity regardless of whether they are on a desktop or mobile device.[85]

128. The **rubiconproject.com** domain is associated with the Rubicon Project, an advertising exchange platform owned by Magnite, Inc.[86] Rubicon Project operates as a Supply-Side Platform (SSP), enabling website publishers to sell their advertising inventory through real-time bidding auctions. Its cookies are used to assign unique identifiers to users, collect data on their browsing behavior (including IP address, location, and websites visited), and facilitate the exchange of this user data with various ad services.[87] This process, known as

---

[82] *See* AdRoll Cookies and Opt-Out Options, accessed September 26, 2025, https://help.adroll.com/hc/en-us/articles/21402369325069-AdRoll-Cookies-and-Opt-Out-Options

[83] *See* Adroll - What Are Cookies? accessed September 26, 2025, https://www.adroll.com/third-party-cookies/what-are-cookies.

[84] *See* AdRoll Cookies and Opt-Out Options, accessed September 26, 2025, https://help.adroll.com/hc/en-us/articles/21402369325069-AdRoll-Cookies-and-Opt-Out-Options.

[85] *See id.*

[86] *See* Platform Cookie Policy - Magnite, accessed September 26, 2025, https://www.magnite.com/legal/platform-cookie-policy/.

[87] *See id.*; *See also* User Choice Portal | Manage Your Privacy Preferences with Magnite, accessed September 26, 2025, https://www.magnite.com/legal/user-choice-portal/.

cookie syncing, allows advertisers to identify and bid on ad impressions to target specific users across the web, forming a foundational component of the programmatic advertising ecosystem.[88]

129. The **casalemedia.com** domain is associated with Casale Media, a digital advertising technology company that operates as part of an ad exchange network.[89] Casale Media's cookies are used to collect data about users' website visits and online behavior, including the number of visits, time spent on sites, and pages loaded.[90] This information is used to build user profiles for the purpose of delivering targeted advertising.[91] The platform enables advertisers to segment audiences and optimize ad relevance by tracking users across multiple websites within its network, and its cookies can also be used for functions like frequency capping to limit the number of times a user is shown the same advertisement.[92]

130. The **bidswitch.net** domain is associated with BidSwitch, Inc., a technology platform that functions as middleware in the programmatic advertising ecosystem.[93] BidSwitch's cookies are not used to directly serve ads to users, but rather to facilitate the service of ads between Supply-Side Platforms (SSPs) and Demand-Side Platforms (DSPs).[94] The cookies store unique user IDs and regulate the synchronization of these IDs across different advertising services.[95] This "cookie syncing" is essential for enabling advertisers on various platforms to recognize a user and participate in real-time bidding auctions for ad space on publisher websites, effectively acting as a central hub for identity matching in the ad-tech industry.[96]

---

[88] *See id.*

[89] *See* https://www.indexexchange.com/about/.

[90] *See* https://www.indexexchange.com/privacy/exchange-platform-privacy-policy/.

[91] *Id.*

[92] *Id.*

[93] *See* https://www.bidswitch.com/

[94] *See* https://www.bidswitch.com/privacy-policy/.

[95] *Id.*

[96] https://clearcode.cc/blog/what-is-bidswitch/.

131. Defendant identified bidswitch cookies as "Advertising Cookies" in its Website Cookie Policy and described their purpose as follows:

| | | | |
|---|---|---|---|
| tuuid_lu | Persistent cookie (expires after 365 days) | Third Party (bidswitch.net) | This domain is owned by IPONWEB and is used to provide a real time bidding platform for online advertising. |

132. The **3lift.com** domain is associated with TripleLift, Inc., an advertising technology platform that specializes in programmatic advertising.[97] TripleLift's cookies are used to assign a unique digital identifier (stored in the "TLUID" cookie) to a user's browser or device.[98] This identifier enables the tracking of users across different websites to collect data for targeted advertising, including interest-based targeting and ad performance measurement.[99] The company also leverages first-party publisher data to create audience segments, positioning this as an addition to traditional third-party cookie tracking in response to industry privacy changes.[100]

133. The **outbrain.com** domain is associated with Outbrain's advertising services. Outbrain, currently owned and operated by Teads Holding Co., uses cookies to assign a unique user ID to a user's device to track their content consumption across a network of partner publisher websites.[101] This data, including browsing history and content engagement, is used to build user profiles and interest segments.[102] These profiles enable Outbrain to serve personalized content and product advertisements, a practice it refers to as "recommendations," to users on its partner sites. Outbrain's promoted content is found on over 100,000 websites, and, in 2020, it provided an average of 10 billion content recommendations or deliveries daily for over 20,000 advertisers.[103] Further, the cookies perform analytics functions to enable

---

[97] *See* https://triplelift.com/.

[98] *See* https://triplelift.com/user-rights-policy-and-opt-out/.

[99] *See* https://triplelift.com/platform-privacy-policy/.

[100] *See* https://triplelift.com/resources/case-study/triplelift-audiences-exceed-benchmarks/

[101] *See* Privacy FAQ - Outbrain, accessed September 26, 2025, https://www.outbrain.com/privacy/privacy-faq/.

[102] *See* Outbrain DSP Cookie Table, accessed September 26, 2025, https://www.outbrain.com/privacy/outbrain-dsp-cookie-table/.

[103] *See id.*

Outbrain to measure and analyze the performance of its services and to ensure that ads are effective and relevant. Outbrain uses machine learning and artificial intelligence to advertise products to consumers that users are likely to find relevant and engaging.[104]

134. The **openx.net** domain is associated with OpenX, a digital advertising technology company that operates a programmatic ad exchange.[105] Defendant identified openx.net cookies as "Advertising Cookies" in its Cookie Policy. OpenX uses cookies to facilitate the buying and selling of digital advertising. These cookies assign unique online identifiers to users, which are used to collect data across different websites about their online activity, browsing history, and inferred interests.[106] This information enables interest-based advertising, allowing advertisers to target specific users with relevant ads. The platform also uses cookies for ad delivery management, such as controlling ad frequency, measuring campaign performance, and syncing user identifiers with other advertising partners.[107]

135. These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

**D. The Third Parties Intercept User Communications While in Transit.**

136. On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw

---

[104] *Id.*

[105] *See* https://www.openx.com/publishers/ad-exchange/.

[106] *See* https://www.openx.com/privacy-center/ad-exchange-privacy-policy/.

[107] *See id.*

payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

137. First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

138. Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[108] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action. This deduplication occurs as the communications are received, before they are stored.

139. Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

140. Fourth, the Third Parties perform real-time ***analytics*** on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine

---

[108] For example, Google's server-to-server API is the Google Ads Conversion API. LinkedIn's is the Conversions API. X (Twitter)'s is the Conversion API.

learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

141. To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

142. On information and belief, the Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[109] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[110] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources, ***transform the data***, and write the data to a destination."[111] One use for Dataflow is the "[r]eal-time machine learning (ML) analysis of streaming data."[112] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[113]

143. Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that

[109] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.

[110] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.

[111] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).

[112] *Id.*

[113] *Id.*

contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendant's Website.

**E. <u>The Private Communications Collected are Valuable.</u>**

144. As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

145. The Private Communications that the Third Parties track and collect by way of the cookies on the Website are valuable to Defendant as well as the Third Parties. Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its software or hardware products to consumers in California, Defendant could use the data collected by the Third Parties to monitor the location of users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendant to target online advertisements to users when they visit ***other*** websites, even those completely unrelated to Defendant and its products.

146. Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's computer graphics card products. On a broader scale, it enables Defendant to gain an understanding of trends happening across its brands and across the computer graphics card market. All of this

helps Defendant further monetize its Website and maximize revenue by collecting and analyzing user data.

147. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[114] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id.* "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id.*

148. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

149. Through its false representations and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant is unjustly enriching itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

**F. <u>Defendant's Conduct Constitutes an Egregious Breach of Established Norms Protecting Individual Privacy.</u>**

150. California has long recognized that technological advances enabling the surreptitious monitoring and collection of information about individuals threaten fundamental privacy interests. In 1967, the California Legislature enacted the California Invasion of Privacy Act ("CIPA"), expressly recognizing that advances in science and technology had created new means of eavesdropping upon private communications and that such practices

[114] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

posed a "serious threat to the free exercise of personal liberties and ***cannot be tolerated in a free and civilized society***." Cal. Penal Code § 630 (emphasis added).

151. In 1972, California voters amended the California Constitution to establish privacy as an inalienable right. The ballot materials supporting the amendment specifically warned of the dangers posed by the increasing collection, accumulation, and dissemination of information about individuals by government agencies and private businesses, including through computerized information systems. The proponents warned that computerization made it possible to create "cradle-to-grave" profiles of individuals and emphasized that "[f]undamental to our privacy is the ability to control circulation of personal information." [115] The amendment reflected a societal judgment that individuals should retain meaningful control over the collection and use of information concerning their personal affairs, rather than being subjected to systematic surveillance and the creation of detailed dossiers without their consent.

152. These policies reflect longstanding social norms recognizing that informational privacy is essential to individual liberty and the functioning of a free and democratic society. The ability to explore ideas, investigate subjects, and pursue personal interests without systematic monitoring is an important aspect of individual freedom. The accumulation of information about individuals by private businesses threatens that freedom by enabling the creation of detailed records of their interests, associations, preferences, and behavior. California's recognition of privacy as an inalienable right reflects the fundamental principle that individuals should retain meaningful control over the collection and dissemination of information concerning their private affairs. That principle is undermined when unrelated third parties secretly collect information about individuals who have expressly declined such tracking.

---

[115] Ballot Pamp., Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, at 26–27, https://www.law.berkeley.edu/wp-content/uploads/2023/10/Voter-Information-Guide-for-1972-General-Election.pdf

153. Modern internet tracking technologies implicate these longstanding concerns. The technologies at issue permitted the Third Parties to recognize individual browsers and devices across different websites and browsing sessions, record users' activities, and associate those activities with persistent identifiers, and user accounts. Through the aggregation and analysis of such information, the Third Parties developed detailed records of individuals' interests, preferences, habits, and behavior. Information that may appear innocuous when considered in isolation can reveal substantially more about an individual when collected systematically and combined with other information.

154. Advances in data analytics, artificial intelligence, and machine learning have further increased the significance of such surveillance. Companies analyze browsing and behavioral information to identify patterns, classify individuals into audience segments, predict interests and future behavior, and draw inferences about personal characteristics and circumstances. In its September 2024 report, *A Look Behind the Screens: Examining the Data Practices of Social Media and Video Streaming Services*, the Federal Trade Commission recognized that companies use algorithms, data analytics, and artificial intelligence to derive information concerning individuals' income, families, personal relationships, interests, and lifestyles. The FTC further recognized that these technologies can undermine consumers' privacy choices by inferring information that consumers deliberately chose not to disclose. Thus, the privacy consequences of collecting and aggregating behavioral information are not necessarily limited to the individual facts initially disclosed. The FTC has also noted, and is studying, the rise of surveillance pricing, where companies exploit personal information and large-scale data collection to set individualized prices and help sellers maximize their revenues.[116]

155. Google itself recognizes that consumers object to the tracking and compilation of their data. In March 2021, its Director of Product Management, Ads Privacy and Trust,

---

[116] Fed. Trade Comm'n Staff, Issue Spotlight: The Rise of Surveillance Pricing 2–3 (2025), https://www.ftc.gov/system/files?file=ftc_gov/pdf/sp6b-issue-spotlight.pdf.

publicly described an erosion of trust associated with tracking and cited research finding that 81% of people believed the potential risks of company data collection outweighed its benefits.[117]

156. Defendant's conduct here was particularly intrusive and offensive because Defendant expressly presented Plaintiffs with the opportunity to reject cookies and tracking by selecting "Decline All." Plaintiffs exercised that choice. Defendant nevertheless caused third-party tracking technologies to operate and information concerning Plaintiffs' browsing activities to be transmitted to the Third Parties. Defendant's disregard of Plaintiffs' express privacy choices was not merely incidental to the intrusion; it was an important circumstance bearing on its offensiveness. Plaintiffs reasonably expected that their refusal would be honored and that their activities would not be disclosed to unrelated third parties through the very technologies they had rejected. Their refusal reflected a decision to withhold their browsing information from those third parties, including for purposes of aggregation, profiling, and commercial targeting. By disregarding that decision, Defendant deprived Plaintiffs of meaningful control over the collection and subsequent use of information concerning their financial interests and activities.

157. The nature and scope of Defendant's conduct, the fundamental rights implicated, the involvement of unrelated commercial tracking companies, the capacity of the tracking technologies to associate browsing activities with persistent identifiers and accounts, the use of the disclosed information to generate additional inferences about Plaintiffs' interests and behavior, and Defendant's disregard of Plaintiffs' express privacy choices collectively constituted an egregious breach of established social norms.

158. Considering the context and manner of the intrusion, a reasonable person would find Defendant's undisclosed interception and disclosure of their activities to unrelated

[117] David Temkin, Charting a Course Towards a More Privacy-First Web, Google Blog (Mar. 3, 2021), https://blog.google/products/ads-commerce/a-more-privacy-first-web/.

third parties, notwithstanding their express rejection of such tracking, highly offensive and an unjustified invasion of their private affairs.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Beltran**

159. Plaintiff Beltran visited the Website to seek and obtain information about NVIDIA's products, while located in California, on or around October 2024.

160. Plaintiff Beltran's visits to the Website were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Beltran is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

161. Specifically, Plaintiff Beltran searched for information regarding GeForce graphics cards. He navigated through various menus on NVIDIA's Website, visited product pages for GeForce graphics cards, reviewed product information, and explored available purchasing options and pricing.

162. When Plaintiff Beltran visited the Website, the Website immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Manage Cookies" button. Plaintiff Beltran viewed Defendant's representation on the popup cookie consent banner that, "NVIDIA uses cookies to enable and improve the use of the website. Please see our Cookie Policy for more information. You can manage your cookie settings by clicking 'Manage Cookies' or going to the NVIDIA Privacy Center." Accordingly, Plaintiff Beltran saw that, rather than choosing to accept such cookies by clicking or selecting the "I Understand" button, users apparently could instead choose to "Manage Cookies" by clicking or selecting the button to do so.

163. To decline the placement or use of cookies and tracking technologies in connection with his use of the Website, Plaintiff Beltran selected and clicked the "Manage Cookies" button. In doing so, Plaintiff Beltran was then presented with Defendant's Cookie Settings window. There, Defendant further represented that, "NVIDIA websites use cookies to deliver and improve the visitor experience." Defendant, through the Cookie Settings

window, represented that the Website used “Performance Cookies[,]” which “[c]ount[] website visits and clicks to understand where people most engage with links[,]” and “Advertising Cookies[,]” which are “[s]et by our advertising partners” and are “used to build a profile of your interests and show you relevant ads on other sites.” The window also represented that the Website used “Required Cookies” that are “required for the site to function” and “cannot be turned off.” Defendant further represented that users, including Plaintiff Beltran, could adjust settings or toggles to turn “off” each category of Performance and Advertising cookies, or click or select the “Decline All” button to decline all such cookies, except those “Required” for the Website to function.

164. Accordingly, Plaintiff Beltran selected and clicked the “Decline All” button, which caused both the popup cookie consent banner and Cookie Settings window to disappear, allowing Plaintiff Beltran to browse the Website, which he then proceeded to do. Plaintiff Beltran believed that selecting the “Decline All” button on the Cookie Settings window found on the Website would allow him to opt out of, decline, and/or reject “All” cookies and other tracking technologies, except those “Required” for the Website to function (but inclusive of those Performance and Advertising cookies that cause the disclosure of tracking data to third-party performance analytics services and advertising networks and for the purposes of providing performance analytics and advertising services).

165. In selecting the “Decline All” button, Plaintiff Beltran gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Beltran specifically declined, based on Defendant’s representations, those cookies “used to build a profile of your interests and show you relevant ads on other sites[,]” “[c]ount[] website visits and clicks to understand where people most engage with links[,]” and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Beltran continue browsing the Website.

166. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for

advertising and performance analytics, to be placed on Plaintiff Beltran's device and/or transmitted to the Third Parties along with user data, without Plaintiff Beltran's knowledge. Accordingly, the popup cookie consent banner's and Cookie Settings window's representations that he could decline the use and/or placement of "All" cookies and tracking technologies while he browsed the Website were false. Contrary to what Defendant made Plaintiff Beltran believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

167. Then, as Plaintiff Beltran continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and Cookie Settings window, and despite Plaintiff Beltran's clear declination of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing advertising and performance analytics from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Beltran's Private Communications as he browsed the Website.

168. Defendant presented Plaintiff Beltran with the option to "Decline All" cookies, and Plaintiff Beltran made this selection to preserve the confidentiality of his nonpublic, Private Communications. This interaction represented a promise by Defendant to Plaintiff Beltran that it would not cause cookies and tracking technologies to be stored on his device that would result in sharing data with third parties, creating a relationship of trust and confidence between Plaintiff Beltran and Defendant. In failing to honor his choice and sharing information obtained by a violation of confidence, Defendant betrayed Plaintiff Beltran's trust. Plaintiff Beltran was harmed by this breach of confidence.

169. Defendant's representations that consumers could "Decline All" cookies while Plaintiff Beltran and other users browsed the Website, or at least those involved in providing advertising and performance analytics, were untrue. Had Plaintiff Beltran known this fact, he

would not have used the Website. Moreover, Plaintiff Beltran reviewed the popup cookie consent banner and Cookie Settings window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline "All" such cookies, Plaintiff would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

170. Plaintiff Beltran continues to desire to browse content featured on the Website. Plaintiff Beltran would like to browse websites that do not misrepresent that users can "Decline All" cookies and tracking technologies. If the Website were programmed to honor users' requests to decline "All" cookies and tracking technologies, Plaintiff Beltran would likely browse the Website again in the future, but will not do so until then. Plaintiff Beltran regularly visits websites that feature content similar to that of the Website. Because Plaintiff Beltran does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to "Decline All" cookies and tracking technologies, Plaintiff will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Beltran is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Brown**

171. Plaintiff Brown visited the Website to seek and obtain information about NVIDIA's products, while located in California, on or around October of 2024.

172. Plaintiff Brown's visits to the Website were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Brown is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

173. Specifically, Plaintiff Brown searched for information regarding GeForce graphics cards that she was interested in purchasing for her son. She recalls using NVIDIA's website search function to locate specific models and reviewing product information, including pricing.

174. When Plaintiff Brown visited the Website, the Website immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to select the "Manage Cookies" button. Plaintiff Brown viewed Defendant's representation on the popup cookie consent banner that, "NVIDIA uses cookies to enable and improve the use of the website. Please see our Cookie Policy for more information. You can manage your cookie settings by clicking 'Manage Cookies' or going to the NVIDIA Privacy Center." Accordingly, Plaintiff Brown saw that, rather than choosing to accept such cookies by clicking or selecting the "I Understand" button, users apparently could instead choose to "Manage Cookies" by clicking or selecting the button to do so.

175. To decline the placement or use of cookies and tracking technologies in connection with her use of the Website, Plaintiff Brown selected and clicked the "Manage Cookies" button. In doing so, Plaintiff Brown was then presented with Defendant's Cookie Settings window. There, Defendant further represented that, "NVIDIA websites use cookies to deliver and improve the visitor experience." Defendant, through the Cookie Settings window, represented that the Website used "Performance Cookies[,]" which "[c]ount[] website visits and clicks to understand where people most engage with links[,]" and "Advertising Cookies[,]" which are "[s]et by our advertising partners" and are "used to build a profile of your interests and show you relevant ads on other sites." The window also represented that the Website used "Required Cookies" that are "required for the site to

function" and "cannot be turned off." Defendant further represented that users, including Plaintiff Brown, could adjust settings or toggles to turn "off" each category of Performance and Advertising cookies, or click or select the "Decline All" button to decline all such cookies, except those "Required" for the Website to function.

176. Accordingly, Plaintiff Brown selected and clicked the "Decline All" button, which caused both the popup cookie consent banner and Cookie Settings window to disappear, allowing Plaintiff Brown to browse the Website, which she then proceeded to do. Plaintiff Brown believed that selecting the "Decline All" button on the Cookie Settings window found on the Website would allow her to opt out of, decline, and/or reject "All" cookies and other tracking technologies, except those "Required" for the Website to function (but inclusive of those Performance and Advertising cookies that cause the disclosure of tracking data to third-party performance analytics services and advertising networks and for the purposes of providing performance analytics and advertising services).

177. In selecting the "Decline All" button, Plaintiff Brown gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Brown specifically declined, based on Defendant's representations, those cookies "used to build a profile of your interests and show you relevant ads on other sites[,]" "[c]ount[] website visits and clicks to understand where people most engage with links[,]" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Brown continue browsing the Website.

178. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for advertising and performance analytics, to be placed on Plaintiff Brown's device and/or transmitted to the Third Parties along with user data, without Plaintiff Brown's knowledge. Accordingly, the popup cookie consent banner's and Cookie Settings window's representations to Plaintiff Brown that she could decline the use and/or placement of "All" cookies and tracking technologies while she browsed the Website were false. Contrary to

what Defendant made Plaintiff Brown believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

179. Then, as Plaintiff Brown continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and Cookie Settings window, and despite Plaintiff Brown's clear declination of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing advertising and performance analytics from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Brown's Private Communications as Plaintiff Brown browsed the Website.

180. Defendant presented Plaintiff Brown with the option to "Decline All" cookies, and Plaintiff Brown made this selection to preserve the confidentiality of her nonpublic, Private Communications. This interaction represented a promise by Defendant to Plaintiff Brown that it would not cause cookies and tracking technologies to be stored on her device that would result in sharing data with third parties, creating a relationship of trust and confidence between Plaintiff Brown and Defendant. In failing to honor her choice and sharing information obtained by a violation of confidence, Defendant betrayed Plaintiff Brown's trust. Plaintiff Brown was harmed by this breach of confidence.

181. Defendant's representations that consumers could "Decline All" cookies while Plaintiff Brown and other users browsed the Website, or at least those involved in providing advertising and performance analytics, were untrue. Had Plaintiff Brown known this fact, she would not have used the Website. Moreover, Plaintiff Brown reviewed the popup cookie consent banner and Cookie Settings window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline "All" such cookies, Plaintiffs would

have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

182. Plaintiff Brown continues to desire to browse content featured on the Website. Plaintiff Brown would like to browse websites that do not misrepresent that users can "Decline All" cookies and tracking technologies. If the Website were programmed to honor users' requests to decline "All" cookies and tracking technologies, Plaintiff Brown would likely browse the Website again in the future, but will not do so until then. Plaintiff Brown regularly visits websites that feature content similar to that of the Website. Because Plaintiff Brown does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to "Decline All" cookies and tracking technologies, Plaintiff Brown will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Brown is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

183. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who browsed the Website after clicking or selecting the "Decline All" button in the Cookie Settings window and/or after toggling off "Performance Cookies" and "Advertising Cookies" in the Cookie Settings window.

184. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

185. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

186. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to "Decline All" cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

187. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

188. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because they, among other things, visited the Website, declined "All" cookies, and had their confidential Private Communications intercepted by the Third Parties, just like the other Class members.

189. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims

alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

190. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

191. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

192. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

193. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" (v) Plaintiffs' and Class members' rights or privacy and confidence recognized at common law; and (vi) Plaintiffs' and Class members' Fourth Amendment right to privacy.

194. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "Decline All" cookies and tracking technologies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function, before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner and Cookie Settings window on the Website, Plaintiffs and Class members declined "All" cookies and reasonably expected that their declination of "All" cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they declined "All" such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

195. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

196. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties—and they in fact do— to, *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles with unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

197. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

198. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

199. Defendant's intrusion into Plaintiffs' privacy constituted a breach of confidence and trust because Defendant had presented Plaintiffs with the option to "Decline All" cookies to preserve the confidentiality of their nonpublic, Private Communications, and ultimately did not preserve the confidentiality of those Private Communications.

200. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

201. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

202. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

203. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Website's use of "All" cookies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

204. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

205. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

206. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner and Cookie Settings window, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

207. The Third Parties' tracking and collecting of Plaintiffs' and the Class members' Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to "Decline All" cookies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function.

208. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's promise that users could "Decline All" cookies, as well as state criminal and civil laws designed to protect individual privacy.

209. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could "Decline All" cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be

transmitted to third parties, even when consumers declined all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they declined "All" cookies and tracking technologies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

210. Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

211. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

212. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

213. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Website's use of "All" cookies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

214. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

215. California Penal Code § 631(a) provides, in pertinent part:

> "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

216. Defendant is a "person" within the meaning of California Penal Code § 631.

217. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

218. Each of the Third Parties is a "separate legal entity that offers 'software as a service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

219. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

220. At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device

information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

221. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

222. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicate the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

223. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

224. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and

Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to "Decline All" cookies in the Cookie Settings window.

225. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

226. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

227. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

228. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk

because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to computer hardware and software products, such as the computer graphics cards Defendant manufactures and sells. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to "Decline All" cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**<u>Fourth Cause of Action</u>: Common Law Fraud, Deceit and/or Misrepresentation**

229. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

230. Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could "Decline All" cookies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function.

231. However, despite Defendant's representations otherwise, Defendant caused third party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked or selected the "Decline All" button in the Cookie Settings window and/or toggled off "Performance Cookies" and "Advertising Cookies" in the Cookie Settings window. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to block unnecessary cookies in the cookie preference window.

232. Defendant affirmatively chose to deploy a cookie consent banner governing the collection, sharing, and use of users' Private Communications on the Website.

233. By implementing the cookie banner, Defendant undertook responsibility for ensuring that the banner accurately communicated users' privacy choices and properly effectuated those choices.

234. Defendant and/or its agents configured and managed which technologies loaded and transmitted data before and after a user disabled third party cookies, including through consent management settings and/or platforms, tag-management rules, and related implementation choices under Defendant's control. On information and belief, Defendant operated, controlled, configured, approved, or maintained settings that permitted the Third Parties' tracking technologies to continue collecting users' Private Communications even after users selected options indicating their choice to disable and/or block unnecessary cookies in the cookie preference window.

235. Industry documentation for the consent management platforms and Third Parties' technologies used on the Website explains that website operators, i.e., Defendant, must affirmatively configure consent settings and tag behavior to prevent tracking technologies from firing after users reject cookies. On information and belief, Defendant received, reviewed, or had access to such implementation guidance in deploying the challenged technologies on the Website. On information and belief, Defendant had the ability during the relevant time period to audit, test, configure, disable, or modify the cookie consent banner, consent-management functionality, and Third-Party tracking technologies operating on the Website. Defendant had information available to it demonstrating that users' purported opt-out selections were not being honored and that users' Private Communications continued to be collected and transmitted to the Third Parties notwithstanding Defendant's contrary representations.

236. Defendant also used the Third Parties' analytics, advertising, and reporting dashboards to monitor Website traffic, user behavior, advertising performance, and related engagement metrics generated through the challenged cookie and tracking technologies. Through these dashboards and related reporting tools, Defendant had access to information

reflecting that user data continued to be transmitted to and processed by the Third Parties notwithstanding users' purported opt-out selections. Defendant routinely reviewed, monitored, and relied upon data generated through the Third Parties' resources for advertising, analytics, personalization, attribution, and/or website performance purposes.

237. Industry standards, privacy frameworks, and applicable statutes and regulations, including California's Consumer Privacy Act and related regulations, require website operators deploying cookie consent banners to ensure that consent mechanisms function properly and accurately record and enforce user choices. *See*, *e.g*., California Consumer Privacy Rights Act Regulations, Cal. Code Regs. Tit. 11, § 7025(c) (enumerating requirements for businesses that receive an "opt out preference signal."); *id.* § 7101 (business record keeping requirements regarding opt out requests).

238. On information and belief, Defendant either knew its representations regarding users' ability to "Decline All" cookies were false, lacked any reasonable basis for believing those representations were true, or made those representations carelessly and recklessly despite information available to Defendant demonstrating that users' data continued to be collected and transmitted to the Third Parties after users attempted to opt out.

239. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant's misrepresentations and omissions concerned material facts that were essential to Plaintiffs' and Class members' decisions as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

240. Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

241. Plaintiffs and Class members have suffered an injury-in-fact, including a breach of confidence and the loss of money and/or property, as a result of Defendant's unfair,

deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

242. Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

243. Defendant's representation that consumers could "Decline All" cookies (including those Advertising cookies "used to build a profile of your interests and show you relevant ads on other sites" and those Performance cookies used to "[c]ount[] website visits and clicks to understand where people most engage with links") if they clicked or selected the "Decline All" cookies button and/or toggled off "Performance Cookies" and "Advertising Cookies" in the Cookie Settings window was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and Cookie Settings window prior to their interactions with the Website. Had Defendant disclosed that it caused third-party non-essential cookies to be stored on Website visitors' devices that relate to personalization, advertising, analytics, and social media and/or share information with third parties even after they choose to decline all non-essential cookies, Plaintiffs and Class members would not have interacted with the Website.

244. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class

members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to decline all cookies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

245. Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

246. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

247. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Website's use of all non-required cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Fifth Cause of Action</u>: Unjust Enrichment**

248. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

249. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

250. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Decline All" cookies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function, and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping

behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members declined "All" such cookies.

251. Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

252. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

253. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

254. It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

255. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

256. Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

257. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully request judgment against Defendant as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H. For reasonable attorneys' fees and the costs of suit incurred; and

I. For such further relief as may be just and proper.

Dated: November 18, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Rajiv V. Thairani (State Bar No. 344390)
rajiv@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*